AO 91 (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### ANDERSON DIVISION

FILED

FEB 27 2003

LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

vs.

Criminal Number 8:03-0046

JOSEPH LAWRENCE FINNEY

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

From on or about June 2001 through the present, in Oconee County, in the District of South Carolina, the defendant(s) did, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, attempt to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, in violation of **Title 18, United States Code, Section 1343**; and conspire to attempt to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such fraudulent scheme or artifice, in violation of **Title 18, United States Code, Section 371**.

I further state that I am a Special Agent, Federal Bureau of Investigation, and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:    ■ Yes    ☐ No

_____
Paul A. Jacobs

Sworn to and subscribed in my presence on February 27th, 2003, at Greenville, South Carolina.

William M. Catoe
United States Magistrate Judge

_____
Signature of Judicial Officer

AO 442 Warrant for Arrest

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### ANDERSON DIVISION

**ORIGINAL**

UNITED STATES OF AMERICA

vs.

JOSEPH LAWRENCE FINNEY

**WARRANT FOR ARREST**

**CASE NUMBER: 8:03-0046**

To:    The United States Marshal or any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest JOSEPH LAWRENCE FINNEY and bring him or her forthwith to the nearest magistrate judge to answer a(n)

☐ **Indictment**        ☐ **Information**        ■ **Complaint**        ☐ **Order of Court**
      ☐ **Violation Notice**        ☐ **Probation Violation Petition**

charging him or her with, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, attempting to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, in violation of **Title 18, United States Code, Section 1343**; and conspiracy to attempt to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such fraudulent scheme or artifice, in violation of **Title 18, United States Code, Section 371**.

|  |  |
|---|---|
| William M. Catoe | United States Magistrate Judge |
| Name of Issuing Officer | Title of Issuing Officer |
| *(signature)* | February 27, 2003        Greenville, SC |
| Signature of Issuing Officer | Date and Location |

Bail to be set by Judge before whom defendant initially appears.

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ | | |
| Date Received | Name and Title of Arresting Officer | Signature of Arresting Officer |
| Date of Arrest | | |

I, Paul A. Jacobs, being duly sworn do depose and say as follows:

A. I am a Special Agent with the Federal Bureau of Investigation currently assigned to the Columbia Division, Greenville, South Carolina Resident Agency. I have been a Special Agent for nineteen (19) years.

B. Beginning in August 1999, I began an investigation in to what is commonly referred to as High Yield Investment Program Fraud (hereafter, HYIP Fraud).

C. I am knowledgeable concerning HYIP Fraud based upon training, research, experience in investigating same and upon consultation with officials and experts from the following investigatory, regulatory, prosecutorial and educational organizations:

United States Treasury Department
United States Bureau of Public Debt
Federal Reserve Corp.
International Monetary Fund
International Chamber of Commerce
The World Bank
Comptroller of the Currency for the United States
United States Central Intelligence Agency
United States Department of Justice
United States National Security Agency
United States Secret Service
United States Securities and Exchange Commission
London Metropolitan Police
United States Attorney, District of South Carolina
United States Attorney, Middle District of Georgia
United States Attorney, Southern District of Ohio
F.B.I. Legal Attache, Bern, Switzerland
F.B.I. Legal Attache, London, England
F.B.I. Economic Crimes Unit, Washington, D.C.
Professor James Byrne, George Mason University School of Law

D. Based upon my training and experience, I am aware of the following facts:

1. "High Yield Investment Program Fraud" is the general term given to fraud schemes that go by various names, including Prime Bank Investment Programs, Prime Bank Debenture Programs , Prime Bank Guarantee, High Yield Trading Programs, Medium Term Note Trading Programs, Standby Letter of Credit Trading Programs and Rolle Programmes.  In these schemes, the fraud artist purports to have access to secret financial trading programs  sanctioned by the Federal Reserve Bank, the Treasury Department, the International Monetary Fund, the International Chamber of Commerce or some other entity involved in international monetary transactions or policy.

2. Claims are made that only a privileged few are invited to participate in the trading of some form of bank security such as guarantees, notes, stocks or debentures which can be bought at discount and traded or sold through a series of purchasers to an end purchaser who has already agreed to pay a price greatly in excess of the original purchase price.  These end purchasers are generally referred to as commitment holders.  The persons who purportedly handle these trades are usually referred to as  traders licensed or authorized by the United States  Federal Reserve.  The perpetrators of this scheme often state that there are a limited number (usually five to seven) traders and commitment holders in the world and that only the top 10, 25 or 50 banks in the world are involved in these trading programs.  These banks are referred to as "Prime Banks" from which the scheme takes one of its names.

3. The investor is guaranteed  that he will receive profits far in excess of any normal investment and is quoted amounts of up to 200% per week.  To receive such a return, the investor is told that he must invest a minimum of $100,000,000.00 and that a portion of the funds must be turned over to the United States Government for humanitarian purposes around the world.  Since September 11, 2001, a variation of this theme has been that the Government's portion of these extraordinary profits will be used to fight terrorism and to provide relief to the victims of the World Trade Center and Pentagon attacks.  The investor is told that his funds are absolutely safe and never at risk in any way.  A key element in inducing investment is to advise the investor that his funds will remain in his own account at his own bank and can never be lost.

4. Standard practice is for the investor first to be directed to provide a Letter of Intent, a Non-Solicitation Agreement, a Confidentiality Agreement, a Non-Circumvention Letter, a Bank Proof of Funds, a Client Information Summary and a copy of the Investor's Passport. The investor is then told that he must go through "compliance," which will be done by the F.B.I., C.I.A., Interpol, N.S.A., Federal Reserve or some other Government "compliance officer." He is also told that his funds will be verified on a "bank to bank" basis to make sure that they do exist and that they are "good, clean, clear funds of non-criminal origin."

5. As the schemes continue, the potential investor's questions are deflected by referring to the confidentiality requirements of the program. In particular, when an investor asks for references from previous investors, he is told that the program's confidentiality requirements prohibit this. The investor is told that if this program ever became known to the general public, it would cause a crash of the world wide economic system because no one would invest funds anywhere but in these programs.

6. The perpetrators of these schemes often introduce the investor to various individuals in different parts of this and other countries who are identified as "brokers," "facilitators," "cutting house operators," "commitment holders," "traders," "compliance officers," "gatekeepers," "government officials," "federal financial task force operatives," members of groups such as the IMF, World Bank, Federal Reserve, etc. Such adding of players is designed to make the investor believe that he is moving ever higher in the chain of persons running these "programs." Additionally, the perpetrators of these schemes often claim to have associations with highly placed persons in the Federal Reserve and government entities such as the Federal Bureau of Investigation and the military. Often times, the names of actual persons such as Allen Greenspan are touted as personal associates.

7. Often, during the course of events, the investor is told that he will not be going into a Federal program after all because of the complexities involved but instead will be going into a commercial transaction which is virtually identical with the same rates of return and guarantees, but which is simpler or quicker to become involved in. This is one of the standard practices of changing the "pitch" as the scheme progresses to gradually gain control of the investor's funds.

8.   Ultimately the perpetrator of these schemes simply steals the investor's funds. This is accomplished by using a variety of banking transactions each having in common the ultimate goal of moving the funds offshore so that they cannot be traced and recovered.  Common methods of effectuating the transfer of funds out of the investor's account include using an assignment of accounts to the perpetrator, assignment to the perpetrator of a Certificate of Deposit purchased by the investor, transfer of the funds into a newly created corporate account controlled by the perpetrator, transfer of the funds into an inactive corporate account owned by the perpetrator, creation of a line of credit against the investor's account which is then used to obtain an equal amount of funds from another bank, and simply transferring the funds by using the information provided by the investor to pose as him and authorize the transfer.  There are innumerable variations on the method in which the funds are ultimately stolen.

9.  There are no secret investment trading programs such as described above.  There are no traders licensed or authorized by the Federal Reserve to deal in such programs.  There are no commitment holders who serve as end purchasers. None of the agencies cited as being involved in such programs are in any way involved.  There is no such thing as Federal Reserve Compliance Officers who "oversee these trading programs" and no law enforcement agency is involved in "doing compliance" on potential investors.

10.  Quite often the scheme is perpetrated in a "Ponzi" fashion, to wit, early investors receive some payments from either their own funds or funds from later investors.  The payments then stop and the investors are repeatedly told that the payoff is coming any day but has been delayed by problems in the foreign country, freezes of the funds by various agencies, banks not cooperating or any other number of bogus excuses.  The simple fact is that the money has been stolen.

11. Certain words and phrases are repeatedly used by those perpetrating these HYIP Frauds.  Some have absolutely no meaning in commercial banking or business practices and others are used in ways contrary to standard practices.  Among the words and phrases that are used in these frauds are:

Humanitarian Projects
European Banking Week
European Banking Year
Facilitator
High Yield Investment Program

Traders
Commitment Holders
Prime Banks
Top Five, Ten or Twenty World Banks
Bank Debenture Trading Programs
Secret Trading Program
Non-Circumvent Agreements
Non-Disclosure Agreements
"Good, Clean, Clear and of Non-Criminal Origin" Funds
Broker
Treasury Approved
Fed Approved
Rolle  Programme
Compliance Officer
Projects
"Rockefellers, Kennedys, etc made their money this way"
"Allen Greenspan controls these programs"
London Short Form
London Short Form Letter of Credit
Proof of Fund or POF
Non-Depletion Account
Hypothecation
Cutting House
Program Grew out of the Marshall Plan
Bretton Woods Agreement

      12.  Warnings concerning this fraud have been published repeatedly in various publications and are easily located on the Internet.  Among the many agencies publishing such notices are the following, along with their Internet Address, where such may be found:

United States Treasury Department
www. publicdebt.treas.gov

Federal Reserve Corp.
www.federalreserve.gov

International Monetary Fund
www.imf.org

Federal Reserve Bank of New York
www.ny.frb.org

World Bank
www.worldbank.org

International Chamber of Commerce
www.iccwbo.org

United States Securities and Exchange Commission
www.sec.gov

Office of the Comptroller of the Currency of the United States
www.occ.treas.gov

United States Federal Bureau of Investigation
www.fbi.gov

13. Should an investor become aware of one of the warnings listed above and question the perpetrator of the scheme, he is told that these are bogus warnings used to keep the programs secret.

14. In August 1999, your affiant began investigating an HYIP Fraud being operated out of Seneca, South Carolina. During the course of this investigation, an individual from Columbus, Ohio, began assisting the F.B.I. as a Confidential Informant (hereafter referred to as the CI). In early 2001, the CI advised that he had been approached by numerous people from around the United States, who, believing him to have a high net worth, offered him opportunities to invest in HYIP's. Your affiant recognized these programs as having all of the earmarks of fraudulent programs.

15. In June 2001, the F.B.I. began an undercover operation designed to capture o n a udio a nd v ideo t ape r ecordings o f p ersons w ho w ere a ttempting t o defraud investors through such bogus trading programs as are outlined above.

16. The CI was instructed to return calls to the person who had contacted him offering HYIP's. The CI was to tell each of these persons that he had a partner in Chicago, Illinois, with whom he was interested in entering into the offered program. The CI was advised to tell people that he and his partner operated

as "Sweet Tea Investments." The CI would then go on to say that he and his partner were interested in a face-to-face meeting to discuss the "programs," however, he and his partner were only together when they were in South Carolina where they were developing resort property. Meetings were then to be set up in South Carolina between the CI, his Chicago partner, and the person(s) offering the "programs."

17. A Special Agent in Chicago, who will hereinafter be referred to by his undercover name of Lou DeFranco, played the role of the CI's investment partner from Chicago. Additionally, your affiant and three other Special Agents in South Carolina took on undercover roles. The names which they used, and what role they played are as follows:

a. Christopher David Martin, a wealthy South Carolina investor;

b. Janie Kirkwood, part-time secretary to the CI, DeFranco and Martin;

c. Paul Jennings, financial advisor; and

d. Rob , limousine driver.

Each of these persons will also be referred to by his or her undercover name throughout this affidavit.

18. A luxurious residence on Lake Keowee, in Salem, South Carolina was rented to serve as the location where the CI and Lou DeFranco supposedly met periodically to work on their resort development. This residence was wired for audio and video and was used as a meeting place where numerous persons involved in these "trading programs" were recorded making their presentations.

19. In order to create the illusion of wealth on the part of the CI and the Special Agents posing as investors, the assistance of two banks in Ohio and one in South Carolina was enlisted. These banks allowed the use of their letterhead to create "account statements" for the "investors" showing deposits of many millions of dollars. To further enhance this undercover scenario, an F.B.I. Special Agent from Columbus, Ohio, played the role of a bank official using the undercover name Mark Thomas, who would verify the account statements. This agent will also be referred to hereafter by his undercover name of Mark Thomas.

20.   In June 2001, the CI advised your affiant that he had been offered an investment opportunity by Peter Johnson from Hampton, Ontario, Canada. The CI was instructed to telephone Johnson and advise him that he was in a position to invest funds along with his partner, Lou DeFranco, a real estate developer from Chicago. A series of telephone calls and meetings thereafter occurred as delineated below. All conversations were recorded, unless specifically noted otherwise.

21.   During the time period of June 29, 2001, through July 15, 2001, the CI and Lou DeFranco had numerous telephone conversations with Johnson. Johnson advised that his associate was Joseph Finney of Colorado Springs, Colorado. In telephone conversations, Johnson and Finney advised the CI and DeFranco that they had a secret, no-risk investment program that was supervised by the United States Government and involved humanitarian projects. They advised that they would provide further information and answer any questions but that such would have to be done in a face-to-face meeting. Both cited confidentiality requirements in declining to present information over the telephone. A meeting with Johnson and Finney was set for July 16, 2001, at the Lake Keowee house.

22.   On July 16, 2001, Johnson and Finney met with DeFranco at the Lake Keowee house. At this meeting, Finney was the primary presenter with Johnson occasionally adding a comment or stating his agreement with what Finney was saying. In summary, Finney made a standard HYIP fraud pitch as outlined above including a recitation about how all of this evolved out of the Marshall Plan and that the program was a method for funding humanitarian projects.

23.   Some particular statements made by Johnson and Finney at the July 16, 2001, meeting were as follows:

Finney:  The program being offered involves the issuance of mid-term notes by top European banks which are ultimately sold to institutional buyers at face value after having been traded multiple times at far less than face value.

Finney:  The program being offered is administered by the "Fed" and that Allen Greenspan runs the program. The program is operated by "traders," "commitment holders" and "providers" all of whom are licensed by the President.

Finney:  His introduction to the program was through the richest man in Poland.

Finney:  In order to go into the program one has to go through compliance which is done by the FBI and CIA.

Finney:  The amount of profit cannot be stated, however, averages will be in excess of 100% per month.

Finney and Johnson:  At one point, all of the Arabian oil millionaires had been in this trading program.

Finney and Johnson:  Finney has been in this business two years and Johnson has been in it over three years.  Both have money invested in the program and have seen their investment multiply eight-fold in the course of a few months.

24.  The meeting of July 16, 2001, ended with Finney leaving several forms for DeFranco to fill out including a Letter of Intent, Securing Documents and a Certificate of Non-Solicitation.  Finney advised that after the documents were completed DeFranco would be introduced to an intermediary whose first name is Bowden.  Finney declined to give the last name.

25.  On July 23, 2001, a telephone conversation was had between Johnson and DeFranco in which Johnson advised that DeFranco would need to send in a Proof of Funds showing that he did have money to invest.  Johnson also stated that he was in the process of placing $650 Million that he had just received from China.

26.  On August 6, 2001, Johnson  sent, via facsimile, to the CI at the Lake Keowee house a letter from Finney directing that a Proof of Funds and Letter of Interest should be sent to Bowden Atherton, President of Freeman, Boydston & Rolyat, Inc. Merchant Bankers, Oklahoma National Bank Building, Tulsa Oklahoma.  Finney's letter advised that upon receipt of the documents ,Atherton would contact the CI.  Your affiant caused these documents to be completed and sent via facsimile to Atherton and  Finney.

27.  In the above-referenced facsimile, Finney further advised that Mr. Atherton and the "power man" would "draw up an agreement"  and that to "reduce compliance time," the "power man" would have to be a signatory on the investors' account.  This was different from Johnson and Finney's earlier assertion that control of the funds would remain solely with the investors.

28. On August 21, 2001, a conference call was had between DeFranco, Finney and Atherton. In summary, Atherton described the program in generally the same terms as had Johnson and Finney. Particular statements made by Atherton were as follows:

     a. The next step is for DeFranco to be introduced to the "project partner;"

     b. The "project partner" represents the "cutting house;"

     c. The "cutting house" works directly with the Federal Reserve which oversees all aspects of the program being offered.

     d. Atherton has been in the business for six (6) years and the business is by invitation only.

29. On August 21, 2001, DeFranco spoke telephonically with Johnson and asked what a "cutting house" was. Johnson advised that this is the facility where the bonds they will be trading are produced.

30. Over the next several days, DeFranco continued to have telephone conversations with Johnson and Finney. Johnson advised DeFranco that Atherton's associate, Victor, whose last name Johnson would not disclose, would be the next person DeFranco would be introduced to. Johnson went on to say that he could now tell DeFranco that he will make a minimum of "25 points" a day on his investment. Finney advised DeFranco that Victor was recommended by a person licensed by President Carter.

31. On August 27, 2001, a conference call was had between DeFranco, Finney, Atherton and Victor who was introduced as Victor Vaccaro from Overland Park, Kansas. Vaccaro made a presentation similar to what Johnson, Finney, and Atherton had made and included the following specific statements:

     a. The introduction into this program requires a Letter of Intent and Proof of Funds which go to the "Director" who sends it to the "Fed."

     b. The next step in the process is for DeFranco to be introduced to Vaccaro's associate, Mark Petkovich.

c. All contracts in the program are approved by the Federal Reserve and that a Federal Reserve official would be assigned to the investor's account; however, if contacted, the Federal Reserve would deny the existence of these programs due to confidentiality.

d. He (Vaccaro) has successfully done one of these transactions each quarter for the last eight years.

e. There is a profit guarantee of 100% per week and an investor's cash always remains in his own bank account; however, the investor must choose among three methods of presenting his funds for entry into the trade programs. They are:

(1) A non-depletion account can be set up and assigned to a corporation that will be created by the "Fed." The investor's funds are then placed in this account.

(Your affiant is familiar with the use of "non-depletion" accounts as used in connection with HYIP Frauds. In such an account, no money is to be removed unless and until a security of an equal value is deposited in the account. In an HYIP Fraud, counterfeit securities, or other worthless documents purporting to have value, are placed in the account while the account's deposits are simultaneously withdrawn. The unwary investor does not realize what has happened until he tries to sell the securities in his account only to find that they are near, or totally, worthless.)

(2) A Certificate of Deposit (CD) or similar instrument is purchased and assigned to the trading partner. The trader then "hypothecates" the instrument in order to obtain cash for trading.

(Your affiant is also familiar with this procedure as used in HYIP Frauds. The investor is led to believe that his funds are secure because they "remain in his own bank" even after the CD is purchased and assigned. It is true that his funds are still in his own bank; however, he no longer owns them–he has used them to purchase the CD which he has then assigned away. The investor is further misled into believing that "hypothecation" is some sort of exotic financial procedure, when, in fact, it means nothing more than borrowing against a security. This procedure causes the investor to buy a security and give the "trader" the ability to borrow against it and abscond with the money.)

(3) The investor can send his money to the trader via a SWIFT MT172.

(Your affiant is familiar with the use of SWIFT's in connection with HYIP Frauds. SWIFT is an acronym for Society for the Worldwide Interbank Financial Telecommunication. This is a private organization dedicated to the promotion and development of standardized global interactivity for financial transactions. The Society operates an electronic messaging service for financial messages, such as letters of credit, payments and securities transactions between member banks worldwide. SWIFT is headquartered at Avenue Adele 1, B-1310 LaHulpe, Belgium. SWIFT has standardized communications referred to by form numbers, each designed to accomplish a certain purpose. In one variation of the Prime Bank Fraud Scheme, an investor is directed to have his bank send a certain numbered SWIFT message to the "trader's" bank and is told that this message merely verifies that he has funds available in his bank and that they have been "blocked;" that is they are pledged to remain there for a certain period of time. In actuality, the SWIFT numbered message that the investor has been given is one which will cause his funds to be transferred to the "trader's" account. The "trader" can then do as he wishes with the funds. Another variation is to use a SWIFT numbered message that allows a line of credit to be opened against the investor's account, which line of credit is then used to deplete the investor's account.)

32. On August 28, 2001, a conference call was had between DeFranco, Vaccaro and Mark Petkovich. Petkovich stated that he was located in Nashville, Tennessee, but would not state for whom he worked until "later in the process." Petkovich made a presentation that is basically the same as did the others person referenced above. In particular, he made the following statements:

a. Vaccaro has been bringing him (Petkovich) clients for quite some time.

b. The next step that DeFranco must take is to be introduced to the Director and Chairman of the "corporation" with whom Petkovich deals directly; however, he cannot reveal the name of this organization until DeFranco "passes compliance." The "Director" is located in British Columbia.

c. The Director and Chairman will direct DeFranco on setting up a non-depletion account and that such will be done in conjunction with the setting up of a new corporation approved by the "Feds". DeFranco will be an officer of that

corporation but cannot have signatory authority on the "non-depletion account"

     d.  A line of credit will be issued against the non-depletion account; however, the funds will not be encumbered, although they must remain in the account for a minimum of 115 days. (Petkovich offered no explanation as to how an account can be used as the collateral for a line of credit but "not be encumbered."

     e.  DeFranco will be guaranteed, in writing, a profit of 125% per week; however, there may be up to 8 trades per day resulting in a daily profit of 200%.

     f. This entire process is top secret because the "Feds" do not want anyone to know about it. It is entirely controlled by the "Feds" who issue the "paper" directly from the Fed pool.

     g. The next step that DeFranco must take is to send, via facsimile, a copy of his passport and a new Proof of Funds to Vaccaro.

     33.  Your affiant did then cause to be sent, via facsimile, to Vaccaro a Proof of Funds and a passport in the name of Lou DeFranco, bearing a photograph of the undercover agent playing that role.

     34. On August 28, 2001, another meeting was had at the Lake Keowee house between DeFranco and Finney. At this meeting, Finney repeated a number of his previous statements about trading programs and further advised DeFranco of the following:

     a.  Petkovich is highly placed in the cutting house which is the "project partner."

     b. The "Director" referred to by Petkovich is the "Director" of the cutting house.

     c.  There are 8 "licensees" appointed by the President.

     d. If DeFranco puts in $100 Million, this will grow to $4 Billion within one year.

e. Finney has $5 Million invested in a similar trading program with another group of individuals.

During the course of this meeting, a conference telephone call came in from Vaccaro and Petkovich and a conversation was had between them and DeFranco. Vaccaro and Petkovich reiterated many of their prior statements concerning how the program works and how the "Fed" controls it. They advised DeFranco that as things have developed, it will not be necessary for him to meet with a compliance officer but that compliance is in fact continuing. DeFranco asked repeatedly for a face-to-face meeting with whomever he would be contracting with and was told that confidentiality may prohibit this.

35. On August 29, 2001, Vaccaro and Petkovich called DeFranco and directed that a Proof of Funds and a letter signed by two officers stating that DeFranco's funds were clean, clear and unencumbered be sent to "Mr. Bal" who would then forward all the documents on to the "Fed." Petkovich stated that everything is ready for a face-to-face and a "signing."

36. On September 6, 2001, DeFranco spoke telephonically with Vaccaro. Vaccaro advised that he had been extremely busy and was dealing with twelve contracts such as DeFranco would be signing. He further stated that the "Chairman of the Board" was ill and that the Federal Compliance Officer deals only with the Chairman. Vaccaro then stated that Bal is the Director and would handle the deal; however, he is located in Vancouver and does not travel. Vaccaro then stated that a contract setting out everything would be sent to DeFranco shortly. Vaccaro went on to say that he had been doing this business for 8 years and was always paid by the cutting house.

37. On September 10, 2001, a document was received, via facsimile, by DeFranco at the Lake Keowee house. Such document was entitled "Reserved Funds Management Account." It listed the parties involved as H & R Financial Ltd. and Lou DeFranco, dba Sweet Tea Investments. The document had been executed by Antonius M. Heijnen as President of H & R Financial. Within this document, Lou DeFranco was referred to as the "financial partner" and H & R was referred to as the "project partner." The document stated the following as to the "Profit Share Schedule:"

Part 1:  100% net return per month for 10 months to Financial Partner, paid monthly (Starting after the second month, see part 2).

Part 2:  First monthly dividend (30 days of credit line issue) will be used for the purchase and sale of MTN's Buy/Sell MTN's will bring net return (before tax) of 100% per week to Financial Partner, paid weekly.

38.  On the document referred to in the paragraph next-above, the address for H & R Financial is listed as 5850 Eubank Blvd. NE # B49-239, Albuquerque, NM 87111.  Your affiant has determined that this is nothing more than a mail drop.  Further, your affiant has determined that H & R has no physical office.

39.  On the document refereed to in the paragraphs next-above, a Web address of http:/go.to/hr-financial is listed.  A web page is found at this address.  This is a single page site with the heading H & R Financial Ltd.  Contained in the site is the following statement: "H & R Financial is an international financial corporation, specialized in investments, project financing, financial restructuring and corporate acquisitions."

40.  Your affiant did then cause a search to be made of the New Mexico Secretary of State's Corporate Records.  A company styled "Ruwach International Holding" was shown as being owned by Antonius M. Heijnen and its registered office address was listed as the same mail drop on Eubank Blvd. that Heijnen used in connection with H & R Financial.  A search of the Internet was made by your affiant and a web page for Ruwach International Holding was found.  The following statements are on the Ruwach International Holding web page:

a.   Ruwach International Ltd. is an international group of Intermediaries, Traders, Bankers, Financiers, Engineers & Consultants.

b. Our head office is located in Albuquerque, New Mexico, USA. We have representative offices in Italy, Canada, The Netherlands, India, Germany and Switzerland with new offices in China and Russia in processing.

c.  We currently hold a total of approx. USD 25-30 Billion in collateral and/or assets and we are involved in joint venture projects in Canada, USA, Brazil, China, Mexico, Panama, East Europe, Greece, Middle East and South Africa.

d.    We are mostly focused on humanitarian projects with involvement of local or national governments. UN and World Bank involvement is of course preferred.

41.    Your affiant has been unable to find any evidence supporting any of the statements made in either the H & R or Ruwach web sites as listed in the paragraphs next-above beyond confirming that Heijnen, acting as H & R Financial and Ruwach International, does have a mail drop address in Albuquerque.

42.    Upon receipt of the contract from H & R Financial, an attempt was made to set up a meeting with Antonius Heijnen or Mr. Bal, whose first name was not known at that point.  Between September 13, 2001, and September 25, 2001, numerous telephonic conversations were had between DeFranco, Vaccaro and Petkovich. Additionally, your affiant, posing as DeFranco's financial advisor Paul Jennings, spoke telephonically with these individuals. During these various calls, both Vaccaro and Petkovich stated that Heijnen was ill and could not meet with DeFranco at that time.    In one conversation, Petkovich stated that federal compliance officers had traveled to New Mexico to meet with the "Chairman" because US dollars were desperately needed in light of the events of September 11. In another conversation, Petkovich stated that the "Fed" was pressuring them for investors due to the disaster.

43.    Although a meeting could not be arranged with Heijnen or Bal, Vaccaro and Petkovich agreed to meet with DeFranco in Chicago in October 11, 2001. This meeting did occur and Vaccaro and Petkovich reiterated their previous statements regarding how the program worked, the need for secrecy, their successful track record, etc. During the meeting, DeFranco executed the contract referred to in paragraph 37 above.  In referring to the contract, Petkovcih stated that the return amounts were correctly stated and that DeFranco would realize a profit of 100% per week plus 100% per month for a total monthly profit of 500% on his investment. Petkovich advised DeFranco that the next step would be for him to convert his account to a non-depleting account and assign this account to Heijnen.

44.    During the meeting in Chicago referred to in the paragraph next-above, Mr. Bal called the office of DeFranco and got Antonius Heijnen on a conference call with DeFranco.  DeFranco placed this call on a speaker phone and Vaccarro, Petkovich, Bal, Heijnen and DeFranco all participated. Heijnen stated that the program being offered was "Fed" controlled, that participants dealt with "Fed traders," that there was an absolute requirement of secrecy, and that banks would

deny the program's existence. When advised that DeFranco had not yet set up a non-depletion account, Heijnen said that they could proceed without doing so. Heijnen directed DeFranco to go ahead and assign his account to him stating that he would use another mechanism to insure that DeFranco's funds could not be lost. (Such a mechanism was never put in place by Heijnen).

45. On October 12, 2001, DeFranco was contacted by Mr. Bal. He stated that his first name was Hardev and he acknowledged that he was an associate of Antonius Heijnen in H & R Financial.

46. In order to make Heijnen and the other participants believe that DeFranco's account had been assigned to H & R Financial, your affiant caused a deed of assignment of the account to be prepared. Your affiant did then cause a letter to be prepared which purported to be a confirmation letter from Mark Thomas at DeFranco's bank addressed to Heijnen advising him that the funds in DeFranco's account had been transferred in to a new account in the name of H&R Financial. This letter was then sent to Heijnen. To further the illusion that funds had been transferred to Heijnen's corporate alter ego, and to introduce the FBI Special Agent playing the role of banker Mark Thomas to Heijnen, Thomas called and advised Heijnen that signature cards must be filled out by him and provided such signature cards. During the calls in which Thomas discussed this with Heijnen, Heijnen told Thomas that he was already "cleared by the Feds" to place the funds in trade and gave some details of the program such as had been presented to DeFranco. Heijnen also advised that Bal's role would be to forward documents and messages.

47. On October 26, 2001, Heijnen had several telephone conversations with Thomas. In these calls he advised that the next step would be a telephone call from a Henry Young in New York who would be calling to verify the funds in the new account. According to Heijnen, Young was the person who was responsible for putting the deal together in New York. Heijnen stated that Young worked with the "Feds" but is not part of the "Fed." Heijnen further advised that Federal protocol required Young to call the main switchboard number of the bank and be put through to the bank officer verifying the funds.

48. On October 26, 2001, Thomas spoke telephonically with Henry Young, who it was learned is associated with the African Trading Company in New York. Young asked for verification that Thomas had signed the letter for the bank verifying the funds that had been placed in Heijnen's account.

49. On October 29, 2001, Thomas spoke telephonically with Henry Young who advised that Antonius would be signing a special document with the United States Government and an I.M.F. official. Young stated that he needed a re-verification of the authenticity of the letters from the bank to be sent via either SWIFT or FAX.

(Your affiant has determined that Young was the subject of an FBI HYIP Fraud investigation in Chicago in the Fall of 2000. Further, your affiant has learned that Young was given written notice by the FBI in Chicago in November, 2000 that these programs do not exist and that the promoting of same is a Federal offense.)

50. On November 2, 2001, DeFranco spoke telephonically with Heijnen who advised that DeFranco's deal will be a Federal Reserve program and that Henry Young is the compliance officer.

51. On November 26, 2001, Tomas spoke telephonically with Heijnen. Heijnen advised that the program that DeFranco was going into would be in conjunction with an entity called Single Digit Asset, Ltd. which had a bank account at First Union Bank in Virginia. Heijnen requested that Thomas send from his bank to the First Union Bank, SWIFT Forms 950 and 760 confirming the funds in the account which had been set up for Heijnen and blocking the account for one year and one month in favor of Single Digit Asset, Ltd. Heijnen went on to state that by initiating these forms, a line of credit would be established and DeFranco would be making profits of 36% per day within a matter of days. Heijnen then sent, via facsimile, to Thomas the following information regarding the Single Digit account:

> Bank: First Union Bank
> Innsbrook Financial Center
> 420 Cox Road
> Glen Allen, Virginia
> Bank Officer: Bill Kissinger
> Acct. Name: Single Digit Asset, Ltd.
> Acct. # 200-000-980-7668

52. Upon being advised of this development by Thomas, your affiant began an investigation into the existence and ownership of the referenced account. It was learned that this was a real account which had been opened approximately one month earlier and the following information concerning it was obtained from First Union Bank:

> Account Name: Single Digit Asset, Ltd.
> Signatories: Marius Vermaak
>                   John Cocoman
> Address for Single Digit Asset Ltd.:  PO Box 4015 Korsten
>                   Port Elizabeth, South Africa
> Account Opened: October 23, 2001
> Business Start Date: October 1, 2001

Further, it was learned from First Union that Vermaak also opened personal accounts at First Union on October 23, 2001. Vermaak provided an address of P.O. Box 202, Green Bushes, Port Elizabeth for these personal accounts.

A Florida address and a Connecticut address were given by Cocoman. It was later learned that Cocoman lived at the Florida address.

All of the accounts had been opened via UPS submission of documents. There was no money at all in these accounts.

53. Your affiant determined that the investigation should, at this point, be moved away from Johnson, Finney, Atherton, Vaccaro, Petkovich, Bal and Heijnen, all of whom had repeatedly tried to sell DeFranco what was clearly a standard fraudulent HYIP investment, and move forward in determining what role Vermaak and Cocoman played. The first step in this was to make Heijnen believe that the SWIFT messages were in the process of being sent causing him to believe that everything was proceeding according to his plan. Documents purporting to be copies of SWIFT Forms 760 and 950 were prepared at your affiant's direction and sent, via facsimile, to Heijnen by Mark Thomas who represented that they were being sent to First Union Bank. Thomas then made up excuses for a "delay" in sending them due to "internal procedures." This allowed your affiant time to put into play an operation to deal with Cocoman and Vermaak.

54. During this time, your affiant consulted with bank officers who advised that the SWIFT Messages 760 and 950 with the wording requested did not comport with standard SWIFT and banking practices. On November 29, 2001, an unknown person, claiming to be Mark Thomas, called Bill Kissinger at First Union Bank and asked if a SWIFT had come in transferring $100,000,000.00 to the Single Digit Asset account. Your affiant is unaware of anyone outside of law enforcement who was aware of this situation other than Heijnen and his associates. Your affiant would submit that it is logical to conclude that Heijnen and his associates believed

that they were in the process of getting DeFranco's funds in to their complete control outside of DeFranco's bank and the call was to determine if they had succeeded.

55. In dealing with Cocoman and Vermaak, your affiant secured the assistance of the security section of First Union Bank. The security section provided a bank officer who, using the undercover name of Brantley Garland, posed as an account executive for large investors. Garland was instructed to contact Cocoman telephonically and represent that there were some questions about the account which needed to be answered.

56. Garland spoke telephonically with Cocoman on December 4, 2001. Cocoman advised that he and Vermaak were partners and that Vermaak was located in South Africa. Cocoman went on to say that the Single Digit Asset, Ltd. account was to be a non-depletion account and that once the funds were in it that "notes" would be coming in in the amount of approximately $100,000,000.00. During this conversation, Cocoman described the trading program in terms and concepts that are classic HYIP Fraud verbiage. Garland advised Cocoman that there had been an error in opening the Single Digit Asset account and that, in order to keep it open, Cocoman and Vermaak would have to appear in person at a branch of the bank. Cocoman advised that he would do so but that there might be a problem with Vermaak because he was in South Africa. Garland advised that he was going to be in Greenville, South Carolina, on December 5, 2001, on another matter and a meeting was set up in Greenville for that date.

57. On December 5, 2001, Garland met with Cocoman at a First Union Bank branch office in Greenville, South Carolina. At this meeting, Cocoman continued to make the standard bogus statements about the trading program. Cocoman also made statements about his background and assets which he has now admitted were totally fictitious. Cocoman was arrested, entered a plea of guilty in Federal Court, and has cooperated with your affiant in this investigation.

58. On December 4, 2001, Garland spoke telephonically with Vermaak in South Africa. He advised Vermaak, as he had Cocoman, that he needed to meet with him. Vermaak resisted this meeting but agreed to send to Garland, via facsimile, information about himself and his program. During this conversation, Vermaak advised that he works with certified humanitarian programs in Mexico and Equador in addition to other places. Vermaak also advised Garland that he was personal friends with the retired senior director of the FBI and that he could have this person meet Garland and vouch for him if necessary.

59. On December 5, 2001, Garland received, via facsimile, a package of materials from Vermaak. Included in this package was a two page cover letter, a one page example of a "conditional SWIFT," a one page example of a Medium Term Note, three pages of documents relating to a Dr. Sheker and Autonomous Youth World Center, which purports to be the humanitarian project involved in this trading program, and a copy of Vermaak's South African passport. Your affiant has examined this package of materials and would testify that it contains the standard HYIP Fraud language such as references to buying and selling Bank Guarantees (for which there is no secondary market) and the use of "Conditional SWIFTs" (which are unknown in legitimate financial transactions.)

60. Over the next several days, Cocoman was debriefed by your affiant. Cocoman stated that he had only recently become involved with Vermaak who had solicited him to open an account and be involved in the sale of "paper." Cocoman stated that he had dealt only with Vermaak and did not know any of the other people whose names are stated herein. He went on to state that any information, other than his false statements about his own background, he had provided to Garland, had been provided to him by Vermaak. Cocoman admitted that he had been on the fringes of fraudulent investment programs in the past. He further stated that he suspected that Vermaak's operation was fraudulent also, but did nothing to ascertain the legitimacy of it.

61. At the request of your affiant, Cocoman placed several calls to Vermaak in an attempt to get him to come to the United States and also to record Vermaak discussing the program. Vermaak did discuss the "program" with Cocoman and the calls were recorded. Vermaak, however, refused to come to the United States to finish the transaction, even when Cocoman offered to pay all of his expenses.

62. First Union Bank was then asked by your affiant to close out the Single Digit Asset, Ltd. account and to advise anyone who asked that this had been done due to non-compliance with bank procedures.

63. At that point, your affiant determined that further contact with Heijnen would result only in cumulative evidence and that the investigation should be ended. In that the investigation of this group of individuals was only one of multiple investigations which your affiant was conducting using the same cast of undercover agents, it was necessary to end contact without disclosing the investigation. Your affiant directed DeFranco to express displeasure to Heijnen with

how things were going and gradually build up to simply telling him that he was not going to invest with him.

64.  In several telephone calls and E-Mail communications, DeFranco did as directed.  Heijnen attempted to convince DeFranco not to back away from the "program."  In one of these communications, Heijnen agreed to have a government official call DeFranco and vouch for the program.

65.  On December 13, 2001, DeFranco was called by a person identifying himself as George Rieg.  This person stated that they had a mutual friend named Antonius Heijnen.  Rieg stated that he was a former FBI Agent and that he was now a part of a financial task force overseeing the trading programs that Heijnen was offering.  Rieg went on to say that this task force operated out of 1600 Pennsylvania Avenue and was run by an Admiral Morris.  According to Rieg, the task force was aware of the problems that Heijnen had had with First Union Bank and they recommended that Heijnen take the investment through London.  Further, Rieg stated that the task force would vouch completely for Heijnen's program.

66.  After several acrimonious exchanges between Heijnen and DeFranco, DeFranco ended his contact with Heijnen and his associates in late December 2001.

67.  Upon closing the DeFranco-Heijnen communications, your affiant did then launch an effort to determine more about George Rieg's role in this matter. Posing as Paul Jennings, your affiant did engage in numerous telephone conversations with Rieg during December 2001, and January 2002.   Your affiant advised Rieg that he might be able to get DeFranco back into the investment and, if that failed, he had another possible investor named Christopher Martin. In discussing these  possibilities and trying to induce investment by either DeFranco or Martin, Rieg made the following statements:

a.  He was formerly an FBI Special Agent.  (Your affiant has verified that this is correct.)

b.  He is part of a Task Force that was first started as the investigative arm of the G-7, now the G-8.

c.  The Task Force is headed by Admiral Lee Morris.

       d.  He (Rieg) is located in Canada, and cannot travel because he has to "man the desk."

       e.  The Task Force has representatives from virtually every Federal agency.

       f.  The Task Force's role is to oversee the secret trading programs that are run by the Federal Reserve .

       g.  All of these programs require a minimum investment of $1,000,000.00.

       h.  His role in the Task Force is to recruit investors into the Federal Reserve secret trading programs.

      68.  During the course of the activities described herein, each of the following individuals made, or caused to be made, one or more completed telephone calls or other wire communications to South Carolina from locations outside of South Carolina, for the purpose of furthering the scheme and artifice that has been described:

> Peter Johnson
> Joseph Finney
> Bowden Atherton
> Victor Vaccaro
> Mark Petkovich
> Hardev Bal
> Antonius Heijnen
> Marius Vermaak
> George Rieg

Sworn to this 27th day of ~~March~~ February 2003.

                            _____

                            Paul A. Jacobs
                            Special Agent
                            Federal Bureau of Investigation